UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

VIJAY BEDASIE,

                             Plaintiff,                **MEMORANDUM & ORDER**
                                                          20-CV-4094 (MKB)

        v.

COMMISSIONER OF SOCIAL SECURITY,

                             Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Vijay Bedasie commenced the above-captioned action on September 2, 2020,

pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the

Social Security Administration (the "Commissioner") regarding his claim for Supplemental

Security Income ("SSI") under the Social Security Act (the "SSA"). (Compl. ¶ 1, Docket Entry

No. 1.) Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, arguing that the findings of Administrative Law Judge Robert R.

Schriver (the "ALJ") were not supported by substantial evidence — namely, his failure to

consider Plaintiff's carpal tunnel syndrome ("CTS") as severe and his residual functional

capacity ("RFC") determination that Plaintiff was capable of performing light work after March

17, 2016 — and that as a result, the ALJ's determination that Plaintiff was not disabled after

March 17, 2016, was not supported by substantial evidence.[1] (Pl.'s Mot. for J. on the Pleadings

---

[1] The ALJ found that Plaintiff was not disabled prior to June 23, 2014, and that Plaintiff
was disabled from June 23, 2014, to March 16, 2016. (Certified Admin. R. ("R.") 94–95, 99,
Docket Entry No. 12.) Plaintiff does not challenge the ALJ's findings (1) that he was not
disabled prior to June 23, 2014, (see Comm'r's Mem. in Supp. of Comm'r's Mot. ("Comm'r's
Mem.") 13 n.7, Docket Entry No. 20-1), and (2) that he was disabled between June 23, 2014, and

("Pl.'s Mot."), Docket Entry No. 17; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket

Entry No. 17-1.)  The Commissioner cross-moves for judgment on the pleadings, arguing that

substantial evidence supported the ALJ's findings.  (Comm'r's Mot. for J. on the Pleadings,

Docket Entry No. 20; Comm'r's Mem. in Supp. of Comm'r's Mot. ("Comm'r's Mem."), Docket

Entry No. 20-1.)

    For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the

pleadings and denies the Commissioner's cross-motion for judgment on the pleadings.

**I.    Background**

    Plaintiff was born in 1975, (Certified Admin. R. ("R.") 116, Docket Entry No. 12), and

has an associate degree in computer information systems, (R. 116).  Plaintiff applied for SSI on

June 27, 2017, alleging disability on the basis of his right shoulder, back, spine, and neck pain.

(R. 90, 93–95.)  The Social Security Administration initially denied his claim on December 6,

2017, and Plaintiff requested a hearing with an administrative law judge on December 22, 2017.

(R. 90).  A hearing was held on April 5, 2019.  (R. 90.)  By decision dated May 14, 2019, the

ALJ determined that Plaintiff was disabled from June 23, 2014, through March 16, 2016, and

that Plaintiff's disability ended on March 17, 2016, but that Plaintiff was not disabled from June

1, 2013 through June 22, 2014.  (R. 90–104.)  On June 30, 2020, the Social Security

Administration Appeals Council denied Plaintiff's request for review of the ALJ's determination,

rendering the ALJ's decision final.  (R. 1–4.)  Plaintiff timely appealed to the Court.  (*See*

Compl.)

---

March 16, 2016, (Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") 5 n.1, Docket Entry No. 17-
1).

### a.   Hearing before the ALJ

On April 5, 2019, Plaintiff appeared at the hearing accompanied by counsel.  (R. 90.)

The ALJ heard testimony from Plaintiff and vocational expert Mitchell Schmidt (the "VE"), who

appeared by phone.  (R. 112–35.)

### i.   Plaintiff's testimony

In 2010, Plaintiff had knee surgery.  (R. 126.)  In August of 2014, Plaintiff had another

knee surgery because his knee "started acting up again or it go[t] worse."  (R. 126.)  Plaintiff had

stopped working in June of 2013 because the towing company where he worked went out of

business.  (R. 118–19.)  While he was looking for work, he got into a car accident on December

23, 2014, (R. 119), and he has not worked since then.  (R. 121.)  Plaintiff has been involved in

three motor vehicle accidents, in December of 2014, April of 2015, and November of 2018.

(R. 125.)  Plaintiff hurt his neck and back during the December 2014 accident and went to Mercy

Hospital, where he saw Dr. Canton.[2]  (R. 119.)  He saw Dr. Canton for physical therapy and

identified him as the main doctor for his neck and back.  (R. 119–20.)  Dr. Stephen Ross, his

physiatrist, was not seeing him at the time, but Plaintiff had started seeing Dr. Armin Tehrany

earlier that year.  (R. 120, 853.)  Dr. Tehrany later performed arthroscopic surgery on Plaintiff's

left arm.  (R. 120.)

Following the motor vehicle accident in December of 2014, Plaintiff was "in a lot of

pain" and underwent magnetic resonance imaging (an "MRI") to show that he had "some

pinched nerves that [were] in between [his] bones."  (R. 120.)  He had pain every day, including

headaches, neck pain, back pain, and arm pain.  (R. 120–21.)  At the time of the hearing, he was

still having headaches, and his doctors had ordered him to undergo some MRI tests.  (R. 121.)

---

[2] Dr. Canton's first name is not included in the record.

He had a "couple" of epidural shots on his neck until he had surgery done in his neck.  (R. 122.)

Plaintiff's neck was "better than what it was," but he still had pain and numbness in both hands

and in his back.  (R. 122.)  At the time of the hearing, Plaintiff's doctors were planning to give

him epidural shots.  (R. 122.)  At that time, Plaintiff's left arm was also in a sling because he had

had surgery on his shoulder two weeks prior as the result of the motor vehicle accident in

November of 2018.  (R. 117.)

    Plaintiff normally drives himself to see his doctors.  (R. 117.)  It takes between ten to

fifteen minutes to drive to his appointments, and he does not drive anywhere else on a regular

basis because when he sits for too long, his neck begins to bother him.  (R. 122.)  Plaintiff can sit

"between [thirty] minutes to . . . [forty-five] minutes" before he has to stand, and he is able to

stand for about the same amount of time.  (R. 122–23.)  The last time that he stood for forty-five

minutes was several days before the hearing.  (R. 123.)  Plaintiff has to alternate among sitting,

standing, and walking because he "just can't stay [in] one place."  (R. 123.)  When asked

whether he could do a job where he could sit and stand whenever he wanted to for eight hours a

day, five days a week, Plaintiff responded that he could not because he had a lot of pain in his

hands, which causes him pain "all the time."  (R. 123.)

    On a typical day, Plaintiff is at home if he is not going to a doctor appointment.  (R. 123.)

He lives with his parents and wife.  (R. 123–24.)  He has breakfast, sits at home, and walks.

(R. 124.)  If he has to go to a doctor appointment, after the appointment he "come[s] right back

and [is] just home for the rest of the day."  (R. 124.)  When he is at home, he lies down or sits

down.  (R. 124.)  He does not do chores around the house; his wife or mother does the shopping,

and his mother cooks.  (R. 123–24.)  He does not have any hobbies.  (R. 124.)

Plaintiff takes medication for his pain, which has some side effects, including drowsiness, nausea, and occasional vomiting.  (R. 124.)  Prior to the operation on his arm, he had difficulty lifting and carrying objects.  (R. 124.)  He did not know the heaviest item he could lift without having a problem.  (R. 124–25.)

### ii.   Vocational expert testimony

The VE noted that the hearing did not involve much testimony, and then categorized Plaintiff's past work based on the record as a tow truck driver, a cable television installer, and a clothing salesperson and stocker.  (R. 128.)  Plaintiff confirmed that he worked as a cable installer in 1999 and as a stocker and salesperson from about 2000 to 2007, and he explained that these were "two parts of one job."  (R. 128–29.)  The ALJ asked the VE to consider several hypothetical individuals with the same age, education, and work experience as Plaintiff. (R. 129–30.)  The VE testified that an individual limited to work at the light exertional level who could only occasionally reach overhead with either arm could not perform any of Plaintiff's past jobs but could perform work in the national economy as a garment sorter, a folder, or a fruit cutter.  (R. 129–30.)

Under questioning by Plaintiff's counsel, the VE testified that these unskilled jobs are for the most part "posturally immaterial," and as long as the employees were productive and maintained their position at the workstation, these jobs could be performed if the person had to rise from a seated position or sit down from a standing position after forty-five minutes for a brief period of time.  (R. 132.)  The VE also testified that if the individual could not complete an eight-hour workday consistently, they would not be able to perform those occupations, as the tolerance for an incomplete workday or not being present in any thirty-day period would be one working day.  (R. 132.)

b.   **Function report**

On August 22, 2017, Plaintiff completed a function report.  (R. 217–27.)  Prior to his illnesses, injuries, or conditions, Plaintiff was able to work and lift things, but at the time of the function report, he could not work.  (R. 219.)  Plaintiff noted that his conditions also affected his sleep but did not explain why.  (R. 219.)  Plaintiff is able to dress, bathe, care for his hair, shave, feed himself, and perform personal hygiene tasks by himself but it is "hard for [him] because of [his] condition."  (R. 219–20.)  He does not need any help or reminders to take care of his personal needs, grooming, or medicine.  (R. 220.)  He does not perform any household chores because of his spinal surgery.  (R. 221.)  Watching television is Plaintiff's hobby and he does this every day, although he cannot watch television all day without having pain in his neck.  (R. 222.) Plaintiff's social activity is limited because of his condition.  (R. 223.)  He goes to doctor appointments regularly.  (R. 222.)  Plaintiff cannot lift heavy objects and he has "carpal tunnel, numbness, tingling, pain" when using his hands.  (R. 223.)  Plaintiff later reported being able to walk ten blocks before having to stop and rest for five to ten minutes and then continuing to walk.  (R. 224.)

Plaintiff also answered a supplemental questionnaire about his pain.  (R. 225–27.) Plaintiff first experienced his pain on April 4, 2015, and he received medical treatment from Dr. Michael Lefkowitz, a neurologist at Long Island Neurosurgical Associates.  (R. 225, 310–11.) He has had MRIs and several X-rays to evaluate his pain and has also had epidural shots.  (R. 226.)  His pain feels like "numbness, tingling, [and] burning" in his neck, back, and hands, and it radiates to his hands.  (R. 226.)  Plaintiff suffers from pain every day.  (R. 226.)  Looking up too much brings him pain, and the length of the pain depends on the activity that he does.  (R. 226.) Plaintiff takes 800 milligrams of Motrin twice a day or as needed, and it relieves the pain for a

few hours.  (R. 226.)  His doctor has prescribed "different medications" in the past but Plaintiff

did not explain why he stopped or changed the medications or which doctor had prescribed them.

(R. 227.)  He reported driving most of the time but noted that it was difficult for him because of

his condition.  (R. 227.)  Plaintiff reported that his activities are limited.  (R. 227.)

### c.   The ALJ's decision

The ALJ concluded that Plaintiff was "disabled" within the meaning of the SSA from

June 23, 2014 through March 16, 2016, but that Plaintiff's disability ended on March 17, 2016.

(R. 91.)  In arriving at this conclusion, the ALJ conducted the five-step procedure for evaluating

disability claims,[3] 20 C.F.R. § 416.920(a), and the eight-step sequential analysis required by the

SSA under Title II when a claimant is found disabled at any point in the process, which

determines whether the disability continues through the date of the decision,[4] 20 C.F.R.

§ 404.1594(a).

---

[3]  The five-step sequential process outlined by the SSA considers:
> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*Demars v. Comm'r of Soc. Sec.*, 841 F. App'x 258, 260–61 (2d Cir. 2021) (quoting *Estrella v.
Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019)).

[4]  The eight-step sequential Title II process considers: (1) whether the claimant is
currently engaged in substantial gainful activity; (2) whether the claimant has an impairment or
combination of impairments which meets or equals the severity of the specified impairments in
the Listing of Impairments; (3) whether there has been any medical improvement; (4) whether
the medical improvement is related to the claimant's ability to work; (5) whether an exception to
medical improvement applies; (6) whether all of the claimant's current impairments in

### i.   Five-step analysis

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 23, 2014.  (R. 93.)  At step two, the ALJ found that from June 23, 2014, to March 16, 2016, Plaintiff had several severe impairments: degenerative disc disease of the lumbar spine; internal derangement of both shoulders; and degenerative disc disease and herniated discs of the cervical spine, status post-discectomy and fusion.  (R. 95.)  The ALJ further determined that while Plaintiff has bilateral CTS, the consultative examiner noted that Plaintiff had "full grip strength and intact hand and finger dexterity" and the review physician noted no limitations regarding hand usage.  (R. 95–96.)  As a result, the ALJ found that Plaintiff's CTS is a non-severe impairment, "especially for the period of March 17, 2016 to the present."  (R. 96.)

At step three, the ALJ found that Plaintiff did not meet and/or equal any of the impairments listed in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings") from June 23, 2014, through March 16, 2016.  (R. 96.)

At step four, the ALJ found that from June 23, 2014, through March 16, 2016, Plaintiff did not have the RFC to perform the full range of sedentary work and thus was disabled during this time period.[5]  (R. 96.)  The ALJ indicated that he considered all symptoms and the extent to which these symptoms could be "reasonably . . . accepted as consistent with the objective

_____

combination are severe; (7) the claimant's residual functional capacity based on current impairments and whether the claimant can perform past relevant work; and (8) whether other work exists that claimant can perform given his residual functional capacity and considering his age, education, and past work experience.  *Roosevelt W. v. Comm'r of Soc. Sec.*, No. 19-CV-6827, 2021 WL 4481198, at *2–3 (W.D.N.Y. Sept. 30, 2021); *see Gibson v. Comm'r of Soc. Sec.*, No. 17-CV-827, 2018 WL 2085635, at *5–6 (N.D.N.Y. May 3, 2018).

[5]  The ALJ noted that Plaintiff was unable to perform any of his past relevant work. Because Plaintiff was "unable to make a successful vocational adjustment," and use transferrable skills from or perform his past relevant work, the ALJ ruled that the finding of "disabled" was appropriate under the framework.  (R. 99.)

medical evidence and other evidence," as well as medical opinion evidence from June 23, 2014, through March 16, 2016, in making his RFC determination.  (R. 96.)  He found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are generally consistent with the evidence from June 23, 2014 through March 16, 2016."  (R. 97.)

In addressing Plaintiff's medical evidence and considering it for purposes of Plaintiff's RFC assessment, the ALJ noted that on June 23, 2014, Plaintiff's right knee buckled, as confirmed through an MRI of the right knee that day showing "moderate-sized joint effusion, tear of the anterior cruciate ligament, tear of the posterior horn of the medical meniscus, and 2.9x0.7cm synovial cyst seen adjacent to the fibular head."  (R. 97.)  An MRI of the cervical spine from February 3, 2015, showed a bulging disc with thecal sac impingement, central herniation with cord impingement, central herniation with thecal sac indentation, and right paracentral herniation with thecal sac indentation.  (R. 97.)  Plaintiff subsequently had a motor vehicle accident in April of 2015.  (R. 97.)  On May 28, 2015, Plaintiff underwent an electromyography and nerve conduction velocity ("EMV/NCV") test, which showed evidence of CTS and evidence of radiculopathy.  (R. 97.)  On August 10, 2015, Plaintiff underwent an anterior cervical discectomy and fusion to address cervical spondylosis with disc herniations and right cervical radiculopathy.  (R. 97.)  An MRI of the right shoulder from January 16, 2015, showed evidence of "supraspinatus tendinosis, and undermining of anteroinferior labrum, compatible with a labral tear."  (R. 97.)  An MRI of the left shoulder from January 15, 2015, showed tendinosis of the posterior fibers of the supraspinatus at insertion, undermining of the anterior labrum compatible with a labral tear, and joint effusion.  (R. 97.)

9

The ALJ also addressed medical evidence of Plaintiff's back pain, including a July 11, 2014 MRI of the lumbar spine, which showed minimal multilevel disc bulges, and another MRI of the lumbar spine from February 3, 2015, which showed bulging discs.  (R. 97.)  A May 6, 2015 lumbar MRI showed left foraminal herniation with impingement.  (R. 97.)

Overall, the ALJ determined that the record for this period reasonably supported the restricted range of sedentary RFC due to Plaintiff recovering from two car accidents and two surgeries.  (R. 97.)  The ALJ considered objective testing, surgical interventions, subjective complaints, and clinical findings during this period, including a July 1, 2015 evaluation from an orthopedist, Dr. Frank Oliveto, which revealed continued positive findings despite an opinion of no continued disability.  (R. 97–98, 344.)  The ALJ noted that Plaintiff had decreased range of motion in the cervical and lumbar spine and decreased range of motion of the bilateral shoulders. (R. 98.)  The ALJ determined that, in summary, the evidence sufficiently supported limiting Plaintiff to a restricted range of sedentary work during this period.  (R. 98.)  Thus, the ALJ determined that from June 23, 2014, through March 16, 2016, Plaintiff was unable to perform any past relevant work, and based on Plaintiff's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  (R. 98–99.)

### ii. Eight-step Title II analysis

At step two[6] of the eight-step analysis, the ALJ determined that Plaintiff has not developed any new impairments since March 17, 2016, the day that his disability ended, and

---

[6] Although the ALJ did not engage with step one of the analysis to determine whether Plaintiff is currently engaged in substantial gainful activity, in the five-step analysis the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since June 23, 2014, the date [Plaintiff] became disabled."  (R. 93.)

therefore his impairments are the same as those present from June 23, 2014, through March 16, 2016.  (R. 99.)  The ALJ found that beginning on March 17, 2016, Plaintiff has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments in the Listings.  (R. 99.)  At step three, the ALJ determined that medical improvement occurred as of March 17, 2016, the date that Plaintiff's disability ended.  (R. 99.)

At step four, the ALJ found that the medical improvement that has occurred is related to the ability to work because there has been an increase in Plaintiff's RFC.  (R. 100.)  The ALJ found that beginning on March 17, 2016, Plaintiff has had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he can only "occasional[ly] reach overhead with either arm."  (R. 100.)  After considering the medical evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the period between March 17, 2016 and the date last insured, December 31, 2017.[7]  (R. 100.)

At step seven, the ALJ determined that Plaintiff could perform light work, "which does not ultimately lead to a finding of disability."  (R. 102.)  The ALJ did not consider medical evidence after the date last insured, December 31, 2017.  (R. 102.)  Also at step seven, the ALJ found that Plaintiff could not perform past relevant work and has not been able to perform past relevant work since March 17, 2016.  (R. 102.)  The ALJ noted that after Plaintiff's neck surgery, Plaintiff was noted to be doing well, with improving neck pain and left-hand numbness found in

---

[7]  The ALJ's decision did not specifically consider, at step five, whether an exception to medical improvement applies, or at step six, whether all of Plaintiff's current impairments in combination are severe, although at step two, he found that Plaintiff's severe impairments are the same as those present during Plaintiff's period of disability.  (R. 99–100.)

November of 2015 but only mild neck pain reported by March 8, 2016.  (R. 100).  By March 17, 2016, Plaintiff traveled to the Bahamas for a vacation.  (R. 100.)  On August 2, 2016, Plaintiff reported exercising daily at home, and a physical examination found Plaintiff to be alert and oriented, in no acute distress, with a pleasant affect, normal neck with scar, and gait within normal limits.  (R. 100.)  The ALJ found that the reported improvement in functioning in addition to the ability to travel to the Bahamas demonstrated an ability to perform a range of light work.  (R. 100.)

The ALJ considered medical evidence from several providers as a basis for his opinion that Plaintiff was not disabled.  The ALJ remarked that follow-up notes from Dr. Vi Quash, Plaintiff's primary care physician at Smart Health Medical, dated March 17, 2016; March 24, 2016; April 2, 2016; and August 18, 2016 found Plaintiff doing well, being alert and oriented, not in any acute distress, having a pleasant affect, having a normal neck with scar, and having a gait within normal limits.  (R. 100.)  Similar medical evidence from February of 2017, May of 2017, June of 2017, and December of 2017 also documented normal findings.  (R. 100.)

The ALJ noted that consultative examiner Dr. Sumit De examined Plaintiff on September 28, 2017, and opined that Plaintiff had a moderate limitation for carrying, pushing, and pulling; a marked limitation for heavy lifting; a marked limitation for all activities requiring overhead reaching; and a mild limitation for sitting for prolonged periods.  (R. 100–01.)  Plaintiff's complaints to Dr. De included neck pain, back pain, history of cervical spine fusion, numbness and pain in the hands, and headaches.  (R. 101.)  The physical examination revealed that Plaintiff appeared to be in no acute distress with a normal gait, was unable to walk on his heels or toes due to pain, was able to stand on his heels, could perform a quarter of a normal squat due to back and neck pain, had a normal stance, required no assistive device, needed no help changing for the

12

examination or getting on or off the examination table, and was able to rise from the chair without difficulty.  (R. 101.)  The ALJ noted that Plaintiff's cervical and lumbar spine showed decreased range of motion with negative straight leg raising, decreased range of motion of the bilateral shoulders bilaterally with full range of motion of the elbows, forearms, and wrists, and full range of motion of lower extremities except for bilateral hips.  (R. 101.)  The neurological exam was negative, and despite Plaintiff's diagnosis of CTS by Dr. Steven Schneider of Long Island Neurosurgical Associates on September 12, 2017, as confirmed by EMG/NCV testing, Plaintiff's hand and finger dexterity were "intact" with complete grip strength bilaterally.  (R. 101, 669.)

The ALJ also considered Dr. Tehrany's and Dr. Ross' notes from January 7, 2019, and thereafter, which indicated that Plaintiff had a motor vehicle accident on November 5, 2018, injuring his right knee and left shoulder.  (R. 101, 816–929, 1103–14.)  Prior to the accident, Plaintiff reported no pain or discomfort in either joint, and his 2010 right meniscus surgery resulted in complete resolution of any problems prior to this accident.  (R. 101.)  Physical examinations immediately after the November 5, 2018 accident revealed tenderness and decreased range of motion in the cervical and lumbar spine, decreased range of motion in the left ankle, and decreased range of motion in the left shoulder with tenderness and positive impingement.  (R. 101.)  Although the January 7, 2019 physical examination showed complete range of active motion in the right knee with only some tenderness, the MRI scan showed a complete tear of the anterior cruciate ligament (the "ACL") in the right knee.  (R. 101.)  On January 30, 2019, Plaintiff underwent right knee surgery to repair the torn right ACL lateral meniscus, and on March 13, 2019, Plaintiff had left shoulder surgery to address a left shoulder tear, impingement, and joint derangement.  (R. 101.)  A follow-up appointment on March 21,

2019, found that Plaintiff "was doing extremely well with both joints" after the surgeries. (R. 101.)  Based on the totality of this evidence, the ALJ found that Plaintiff's condition improved to the point that he could do a range of light work as of March 17, 2016, through December 31, 2017.  (R. 101.)

The ALJ stated that he fully considered the medical opinions and prior administrative medical findings and did not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s)."  (R. 102.)

The ALJ found Dr. De's September 28, 2017 opinion persuasive because it was "supported by a detailed report containing [Dr. De's] clinical findings on physical examination" that Plaintiff had a normal gait, full strength, no significant neurological deficits, and intact hand and finger dexterity.  (R. 102.)  Dr. De had opined that Plaintiff had a moderate limitation for carrying, pushing, and pulling; a marked limitation for heavy lifting; a marked limitation for all activities requiring overhead reaching; and a mild limitation for sitting for prolonged periods. (R. 102.)

The ALJ found Dr. M. Daniel's October 30, 2017 opinion "somewhat persuasive."[8] (R. 102.)  Dr. Daniel had opined that Plaintiff was limited to a range of light work with additional limitations in postural movements, and the ALJ found that this was supported by a review of the record as it stood at the time but was only "partially consistent with the record as a whole" because the record at the time did not support postural limitations, although it did support limiting overhead reaching with bilateral shoulders.  (R. 102.)

---

[8] While the ALJ's decision refers to this as "Exhibit 1A," the Court notes that Exhibit 1A is the Social Security Administration's Disability Determination Explanation, not Dr. Daniel's report.

The ALJ found unpersuasive Dr. Oliveto's July 1, 2015 opinion that Plaintiff had no evidence of orthopedic disability and had "reached [pre]-accident status," with an ability to perform all activities of daily living because Plaintiff was recovering from shoulder surgery and had recently experienced a second motor vehicle accident at the time.  (R. 102.)

At step eight, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff could perform, including garment sorter, folder, and fruit cutter.  (R. 103.)

Accordingly, the ALJ determined that Plaintiff's disability ended on March 17, 2016, and Plaintiff has not become disabled again since that date.  (R. 103.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (same); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  *Talyosef v. Saul*, 848 F. App'x 47, 48 (2d Cir. 2021) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012)).  In

deciding whether substantial evidence exists, the court will "defer to the Commissioner's resolution of conflicting evidence."  *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the Commissioner's decision.  *See Ewen v. Saul*, No. 19-CV-9394, 2021 WL 1143288, at *11 (S.D.N.Y. Mar. 23, 2021) (citing *Moran*, 569 F.3d at 112); *see also Prince v. Astrue*, 514 F. App'x 18, 19–20 (2d Cir. 2013) (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).

### b.    The ALJ erred in assessing the severity of Plaintiff's CTS

Plaintiff contends that the ALJ's determination that his CTS "is not severe and does not result in more than minimal limitations" is not supported by substantial evidence.[9] (Pl.'s Mem. 11–13.)

The Commissioner argues that the ALJ's determination is based on substantial evidence, as the record "as a whole does not show that [CTS] significantly limited [Plaintiff's] ability to perform the physical demands of work."  (Comm'r's Mem. 12–17.)

At step two of the traditional five-step analysis, the ALJ must determine whether the claimant has a medically severe impairment or a combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); *see*

---

[9]  Because Plaintiff contests the finding of being non-disabled as of March 17, 2016, rather than the finding of disability that stemmed from the ALJ's consideration of the traditional five-step analysis, the Court conducts the relevant analysis under the eight-step analysis, which the ALJ used to assess Plaintiff's RFC after that date.  The Court notes that step two in both the eight-step analysis and the traditional five-step analysis are fundamentally identical and because the ALJ did not engage in a new analysis of Plaintiff's severe impairments for the eight-step analysis, (R. 99 ("[Plaintiff] has not developed any new impairment. . . . Thus, [Plaintiff's] current severe impairments are the same as [those] present from June 23, 2014 through March 16, 2016.")), the Court refers to and relies on the ALJ's determination in the five-step analysis.

*also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521.  A claimant's ability to perform basic work

activities refers to the scope of abilities and aptitudes necessary to do most jobs.  *See Bourdier v.*

*Saul*, No. 19-CV-205, 2020 WL 705211, at *3 (E.D.N.Y. Feb. 12, 2020) (quoting 20 C.F.R. §

416.922(b)).  Although the Second Circuit has held that the second step is limited to "screen[ing]

out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence

of a disease or impairment, or establishing that a person has been diagnosed or treated for a

disease or impairment" is not, by itself, sufficient to render a condition "severe," *Taylor v.*

*Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012).  A claimant has the burden of establishing the

existence of a severe and medically determinable impairment for the requisite twelve-month

period.  *See Green-Younger v. Barnhart*, 335 F. 3d 99, 106 (2d Cir. 2003); *see also Booker v.*

*Astrue*, No. 07-CV-646, 2011 WL 3735808, at *1 (N.D.N.Y. Aug. 24, 2011) (citing *Green-*

*Younger*, 335 F.3d at 106).  "Even an impairment found not to be severe is entitled to

consideration by the ALJ."  *Id.* at *5 (citing 20 C.F.R. § 404.1545(a)(2)).

        "A severe impairment is one that significantly limits an individual's physical or mental

ability to do basic work activities."  *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010)

(citing 20 C.F.R. §§ 404.1520(c), 416.920(c)) (holding that a condition was not serious where the

plaintiff's "medical records fail[ed] to discuss [the condition] at all"); *Cardoza v. Comm'r of Soc.*

*Sec.*, 353 F. Supp. 3d 267, 275 (S.D.N.Y. 2019) (noting that a severe impairment "significantly

limits [the claimant's] physical or mental ability to do basic work activities").  The SSA defines

"basic work activities" as "abilities and aptitudes necessary to do most jobs," *Farnham v. Astrue*,

832 F. Supp. 2d 243, 254 (W.D.N.Y. 2011), and these activities include "walking, standing,

sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and

speaking."  *Acevedo v. Saul*, 577 F. Supp. 3d 237, 246–47 (S.D.N.Y. 2021) (alteration in

original); *Cardoza*, 353 F. Supp. 3d at 279 (same); *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 569

(S.D.N.Y. 2013) (listing activities considered "basic work activities").  The mere presence of a

disease or impairment, by itself, is insufficient to render a condition severe.  *See Taylor*, 32 F.

Supp. 3d at 266 (holding that "establishing that a person has been diagnosed or treated for a

disease or impairment" alone is insufficient for a finding of severity); *Matejka v. Barnhart*, 386

F. Supp. 2d 198, 209 (W.D.N.Y. 2005) ("[A]n impairment is not severe if it has no more than a

minimal effect on an individual's physical or mental ability[] to do basic work activities."

(quoting SSR 85–28 (Policy Clarification), 1985 WL 56856 (Jan. 1, 1985))).

The ALJ determined that Plaintiff had severe impairments, namely degenerative disc

disease of the lumbar spine; internal derangement of both shoulders; and degenerative disc

disease and herniated discs of the cervical spine, status post-discectomy and fusion, and also

suffered from CTS as a non-severe impairment, "especially for the period of March 17, 2016 to

the present."  (R. 95–96.)  In making the determination that Plaintiff's CTS is a non-severe

impairment, the ALJ exclusively relied on the fact that the consultative examiner "noted that

[Plaintiff] had full grip strength and intact hand and finger dexterity" and the reviewing

physician noted no limitations regarding the use of hands.  (R. 95–96.)  At step two of the eight-

step analysis, the ALJ found that Plaintiff's "current severe impairments are the same as [those]

present from June 23, 2014 through March 16, 2016."  (R. 99.)  However, based on the medical

evidence, the ALJ's assessment of CTS as a non-severe impairment is not supported by

substantial evidence.  On May 28, 2015, Dr. Miriam Kanter and Dr. Nitin Narkhede first found

that Plaintiff tested positive for CTS and prescribed "cock-up splints" for Plaintiff.  (R. 398.)  In

May of 2016, Dr. Jai Hira, a neurologist, noted that Plaintiff's neurologic exam was significant

for "sensory deficits" in his right hand and recommended that Plaintiff undergo additional

testing.  (R. 338.)  In May and December of 2016, Dr. Lefkowitz reported Plaintiff's complaints

of left hand numbness and bilateral hand numbness.  (R. 310, 312.)  Dr. Lefkowitz referred

Plaintiff to Dr. Steven Schneider, a colleague experienced with peripheral nerve disease.

(R. 311.)  Following a visit by Plaintiff on September 12, 2017, Dr. Schneider opined that

Plaintiff would require right-hand CTS surgery in the "near future," noted that Plaintiff had

"bilateral [CTS] as reported on nerve conduction studies," and found that there were objective

"tinel and phalen" signs bilaterally.  (R. 668, 670.)  In addition, Plaintiff's own testimony

supports the medical evidence.  Plaintiff wrote in his August 22, 2017 function report that he

experienced "numbness, tingling, [and] pain" when using his hands."  (R. 223.)  During the

hearing before the ALJ, Plaintiff described pain and numbness in his hands that kept him from

performing daily activities.  (R. 122–23.)  The totality of the evidence undermines the ALJ's

assessment of Plaintiff's CTS as non-severe, requiring remand.  *See Dorta v. Saul*, No. 18-CV-

396, 2019 WL 3503961, at *11 (S.D.N.Y. Aug. 2, 2019) ("The reports from [the plaintiff's]

physicians combined with his own testimony raise [the plaintiff's] carpal tunnel syndrome above

the *de minimis* level.  On remand, the ALJ should reconsider whether [his] carpal tunnel

syndrome is a severe impairment." (footnote omitted)); *Davila v. Comm'r of Soc. Sec.*, No. 16-

CV-4774, 2018 WL 5017748, at *12–17 (E.D.N.Y. Oct. 16, 2018) (finding that the ALJ's

opinion that plaintiff's carpal tunnel was not severe was not based on substantial evidence when

considering the plaintiff's function report and the evaluating physicians' opinions that plaintiff's

carpal tunnel gave rise to significant limitations); *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 155

(N.D.N.Y. 2012) ("At the very least, the ALJ should have given more consideration as to

whether [the plaintiff's] diagnosed and documented carpal tunnel syndrome resulted in a more

than a *de minim[i]s* limitation on her ability to manipulate objects and use her hands . . . more

generally in the performance of basic work activities. . . . A remand is therefore recommended for reconsideration of this issue.").

### c.    The ALJ erred in failing to consider Plaintiff's CTS in subsequent steps beyond step two

Plaintiff also argues that the ALJ erred in his RFC evaluation because he found that Plaintiff possessed the RFC to perform light work with exceptions but did not consider the manipulative limitations of his hands or fingers. (Pl.'s Mem. 14–16; Pl.'s Reply in Further Supp. of Pl.'s Mot. ("Pl.'s Reply") 3, Docket Entry No. 21.) Plaintiff argues that even if his CTS were considered non-severe, the ALJ was nevertheless required to consider and discuss the non-severe impairment in determining his RFC. (Pl.'s Mem. 14.)

The Commissioner argues that the ALJ considered "numerous factors" in evaluating Plaintiff's RFC, including medical evidence, non-medical evidence, and Plaintiff's statements about activities that he could perform. (Comm'r's Mem. 12.) The Commissioner does not directly respond to Plaintiff's argument that the ALJ must consider and discuss all non-severe impairments. (*See generally* Comm'r's Mem.)

Where an ALJ excludes certain impairments from the list of severe impairments at step two of the sequential analysis, any such error is harmless if the ALJ identifies some severe impairments so that the analysis proceeds and the ALJ considers the effects of the omitted, non-severe impairments during the subsequent steps following step two. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding any error by ALJ in excluding knee injury as a severe impairment was harmless because ALJ identified other severe impairments and considered knee injury in subsequent steps (citing 42 U.S.C. § 423(d)(2)(B))); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error by ALJ in excluding claims of anxiety disorder and panic disorder from step two of analysis would be harmless because ALJ

20

identified other severe impairments and specifically considered the claims of anxiety and panic

attacks in subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding

remand would not be warranted due to the ALJ's failure to recognize disc herniation as a severe

impairment because "the ALJ did identify severe impairments at step two, so that [the plaintiff's]

claim proceeded through the sequential evaluation process" and the ALJ considered the

"combination of impairments" and "all symptoms" in making determination); *Acevedo*, 577 F.

Supp. 3d at 247 (stating that the ALJ is obligated to consider all of the claimant's medically

determinable impairments, including those that were found to be not severe at step two).

However, remand is warranted when an ALJ fails to "account for limitations imposed by both

severe and non[-]severe impairments."  *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir.

2012) (citing 20 C.F.R. § 404.1545(a)(2) and 20 C.F.R. § 416.945(a)(2)); *see also Frank J. v.*

*Comm'r of Soc. Sec.*, No. 20-CV-687, 2021 WL 4241439, at *3 (W.D.N.Y. Sept. 17, 2021)

("[W]here an impairment is excluded at step two and the ALJ fails to account for functional

limitations associated with the impairment in determining the claimant's RFC, remand for

further proceedings is appropriate."); *Douglas v. Saul*, No. 20-CV-322, 2021 WL 2852962, at *9

(S.D.N.Y. July 8, 2021) (noting that "SSA regulations specifically state: '[w]e will consider all

of your medically determinable impairments of which we are aware, including your medically

determinable impairments that are not "severe". . . when we assess your residual functional

capacity' . . . . [A]n ALJ's RFC determination 'must account for limitations imposed by both

severe and non[-]severe impairments'").

      The ALJ determined that Plaintiff had the RFC to perform "light work" and that his only

limitation was that he could "only occasional[ly] reach overhead with either arm."  (R. 100.)

The ALJ did not address any impairments related to finger or hand manipulation, (R. 100), and

by failing to do so, the ALJ did not consider how Plaintiff's CTS affected his RFC and thus failed to "take [all of the plaintiff's impairments] into account when determining [the plaintiff's RFC]." *Parker-Grouse*, 462 F. App'x at 18; *see Fiutko v. Berryhill*, No. 17-CV-686, 2019 WL 2635738, at *3 (W.D.N.Y. June 27, 2019) (remanding where the ALJ "mentioned no manipulative limitations" and thus did not clearly consider the plaintiff's non-severe carpal tunnel diagnosis); *Davila*, 2018 WL 5017748, at *12 ("[T]he 2014 ALJ [d]ecision acknowledges that [the] plaintiff was diagnosed with carpal tunnel syndrome . . . [t]he ALJ, however, determined that [the] plaintiff's carpal tunnel syndrome 'is not as severe as alleged' and 'does not result in more than minimal limitations.' Moreover, the ALJ did not clearly address [the] plaintiff's carpal tunnel syndrome, or any potentially resulting manipulative limitations, in his RFC analysis." (citations omitted)).

There is no dispositive test for how thoroughly the ALJ must weigh the limitations imposed by the non-severe impairments in the RFC determination, but the ALJ must at the very least consider all of them. *See Parker-Grouse*, 462 F. App'x at 18 (holding that the ALJ committed legal error by not accounting for all of plaintiff's non-severe impairments). The ALJ's questioning of the VE expert at the hearing, for example, where he posed a question about a hypothetical individual who did not have any such limitations, demonstrates that the ALJ failed to consider Plaintiff's CTS. (R. 129–30.) The ALJ's decision briefly notes that Dr. De's examination revealed "intact hand and finger dexterity" with full grip strength despite Plaintiff's diagnosis of CTS several days earlier, (R. 102), and accordingly states that Plaintiff could work as a garment sorter, folder, or fruit cutter, (R. 103), occupations that require finger movements and which would be affected by hand limitations, *see Hamilton v. Colvin*, 8 F. Supp. 3d 232, 242 (N.D.N.Y. 2013) ("Rather, it appears the ALJ dismissed the diagnosis [of carpal tunnel

syndrome] after concluding the impairment was non-severe.  This is significant because the ALJ

found that [the plaintiff] retained the RFC to perform . . . jobs [that] require good use of both

hands and the fingers."); *cf. Waldvogel v. Comm'r of Soc. Sec.*, No. 16-CV-868, 2017 WL

3995590, at *5 (N.D.N.Y. Sept. 11, 2017) (finding that the ALJ "considered the evidence related

to carpal tunnel syndrome, both at Step Two and when assessing the RFC" where the ALJ

"included limitations for frequent bilateral fingering and feeling" and "included a discussion of

the treatment evidence related to carpal tunnel syndrome in the written decision").  The ALJ does

not consider, for example, Plaintiff's reports of daily hand pain, (R. 123), Plaintiff's reports of

bilateral hand numbness throughout 2016, (*see, e.g.*, R. 310), Dr. Lefkowitz's referral for

Plaintiff to Dr. Schneider, who had expertise with peripheral nerve disease, (R. 311), and Dr.

Schneider's opinion and assessment that Plaintiff would likely require right hand CTS surgery in

the "near future," (R. 668).  While the ALJ did not weigh any post-December 2017 evidence,

there is also evidence in the record demonstrating Plaintiff's CTS was a consistent problem that

was not resolved with surgeries.  (*See, e.g.*, R. 867.)

Because the ALJ failed to account for any functional limitations associated with

Plaintiff's CTS in determining Plaintiff's RFC, the Court remands the case.  *See Monteith v.

Comm'r of Soc. Sec.*, No. 20-CV-1648, 2021 WL 2895655, at *3 (E.D.N.Y. July 9, 2021) ("The

failure to take [all of plaintiff's impairments] into account in the RFC determination is grounds

for remand."); *Ann P. v. Saul*, No. 19-CV-711, 2021 WL 671894, at *6 (W.D.N.Y. Feb. 22,

2021) (remanding for the ALJ to examine whether the plaintiff's condition was "severe or non-

severe in nature, and the limiting effects it may have on [the plaintiff's] RFC assessment").

## III.  Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings.  The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

Dated: September 17, 2022
      Brooklyn, New York

SO ORDERED:


      s/ MKB
MARGO K. BRODIE
United States District Judge